Litchfield Creamery Company v. Commissioner.
Litchfield Creamery Co. v. Commissioner
Docket No. 110318.
United States Tax Court
1943 Tax Ct. Memo LEXIS 78; 2 T.C.M. (CCH) 929; T.C.M. (RIA) 43458; October 19, 1943
*78 Earnings and profits of petitioner were not permitted to accumulate during the years 1938 and 1939 beyond the reasonable needs of its business nor was petitioner availed of to prevent the imposition of surtaxes upon its shareholders. Jay C. Halls, Esq., Anderson A. Owen, Esq., 1 N. LaSalle St., Chicago, Ill., and Raymond E. Rickbeil, C.P.A., for the petitioner. John D. Kiley, Esq., and H. H. Hart, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax for the years 1938 and 1939 in the respective amounts of $49,248.74 and $49,003.11. The determination was based upon the Commissioner's holding that during the tax years petitioner's earnings were permitted to accumulate beyond the reasonable needs of its business with the purpose of preventing the imposition of surtaxes upon its shareholders. Whether or not he was correct in this view is the only issue presented for our decision. Petitioner's returns were filed in the eighth district of Illinois. Findings of Fact Petitioner was incorporated under the laws of Illinois on February 8, 1913 with an authorized capital of $5,000 divided into 50 shares of a par *79 value of $100 each. The purpose for which it was organized, as stated in the articles of incorporation, was to buy cream and milk, manufacture and deal in butter, cheese, ice cream and all dairy products, and deal in creamery machinery and farm products of all kinds. Prior to 1936 petitioner's only plant was located at Litchfield, Illinois. In the early years petitioner engaged in a general creamery business, buying whole milk from farmers, manufacturing it into butter, ice cream, cottage cheese and buttermilk, and selling some whole milk. The business prospered to some extent and capital was increased to $120,000 by the end of 1917. Annual business exceeded $1,000,000 in volume. The company had been expanding too rapidly, however, and after the last war the business declined and losses of approximately $134,000 were sustained in the three years from 1919 through 1921. At the end of 1920, with a capital stock of $167,200, petitioner had a deficit of $111,652.30. By 1922 condensing and canning equipment had been installed with which to manufacture evaporated milk. An increasing amount of evaporated milk was produced and the general creamery business was continued. There was a modest *80 net profit in each of the years 1923 to 1933, inclusive, ranging in amounts from a low of $5,636.74 to a high of $35,801.20. Capital stock was reduced in 1927 to $54,100, at which figure it remained until 1936. Some dividends were paid in each of the years 1921 to 1935, from $2,704.91 to $8,947 per year. At the close of 1933, with a reduced capital of $54,100, petitioner still had a deficit of $29,120.18. By the end of 1935 the deficit had been wiped out and petitioner had a surplus of $89,446.40. Petitioner's business was carried on under the supervision of William H. Hartke and Charles Hauser, who became interested in the company shortly after its formation. Hartke was president and a director of petitioner during the tax years and Hauser was secretary, general manager and a director, having been secretary since 1918. In the tax years these two individuals and members of their families (wives, children, brothers and sisters, of whom there were 22) owned approximately two-thirds of petitioner's outstanding stock. The balance was owned by approximately 44 other stockholders. In 1929 petitioner acquired 51 per cent of the stock of Carolene Products Company, a Michigan corporation *81 which owned a license granted by the Carnation Milk Company to manufacture a patented compound consisting of skim milk and vegetable oil. The other 49 per cent of the stock of Carolene Products Company was owned by one Carroll. In 1930 petitioner began to manufacture the vegetable oil compound under the trade names of Carolene and Milnut. All of its production of this compound was sold to Carolene Products Company, which in turn distributed it to the trade. The manufacture of the compound comprised the purchasing of whole milk from farmers, separating and drawing off the cream, adding to the skim milk a portion of coconut oil, removing water by evaporation, and sealing the resulting product in small cans. The valuable by-product, cream, was sold as such or processed into butter. In 1938 petitioner added fish oil containing vitamins A and D to the mixture. The 51 per cent of the stock of Carolene Products Company acquired by petitioner in 1929 was sold by it in 1932 to Hartke and Hauser, who continued to own it during the taxable years 1938 and 1939. The other 49 per cent was held by Carroll until December 9, 1939, when it was acquired from him by members of the families of Hartke *82 and Hauser. Due largely to the manufacture and sale of the vegetable oil compound, petitioner's business markedly increased in the years from 1931 through 1941, with the most rapid expansion beginning about 1936. Total gross sales increased from $519,443.92 in 1931 to $1,418,021.19 in 1935, $2,147,295.87 in 1936, $2,746,271.60 in 1938, $3,035,176.07 in 1939 and $5.713,936.05 in 1941. The extent to which this increase was due to the vegetable oil compound business is reflected in the fact that in 1931 sales of this product amounted to only $10,107.75, the greatest source of revenue in that year being from evaporated whole milk in the amount of $297,084.72. By 1938 sales of evaporated whole milk had dropped to $14,862.78, while sales of the vegetable oil compound had increased to $1,379,740.47 and its by-products (butter and cream) to $1,230,568.28. Thus, sales of the compound and butter and cream accounted for $2,610,308.75 of the total sales of $2,746,271.60 in 1938 and for $5,512,361.51 of the total sales of $5,713,936.05 in 1941. Petitioner began the year 1936 with total assets of $291,740.98. Roughly, these comprised cash of $47,000, accounts receivable of $41,000, inventory of *83 $38,000, listed securities of $30,000, a net investment in a related business of $35,000, miscellany of $6,000 and fixed assets depreciated to $95,000. With current liabilities of $94,000, notes and bonds outstanding of $54,000 and capital stock of $54,100, there was a surplus of $89,446.40. In the two years 1936 and 1937 petitioner's net earnings after taxes were roughly $137,000 and $195,000, respectively. In those years it distributed as dividends the respective sums of $124,000 and $166,000, leaving net undistributed earnings for such years of $39,876.16, which increased surplus to $129,892.56 at the beginning of the first taxable year (1938). In the same two years, 1936 and 1937, capital stock had been increased to $360,666.68, an increase of $306,566.68. Total assets had been increased by January 1, 1938 to $657,000. This increase over the $291,000 figure of January 1, 1936 was reflected principally in accounts receivable, which increased from $41,000 to $141,000, inventory, which increased from $38,000 to $145,000, and in fixed assets, for which petitioner expended $118,000 in 1936 and $51,000 in 1937. Of the latter amounts approximately $76,000 was expended for buildings, *84 machinery and equipment at the Litchfield plant. Approximately $78,000 was spent for buildings and machinery at Winona Lake, Indiana, where in 1936 petitioner acquired its second plant. The balance of the increase in total assets was accounted for in a growth of cash from $47,000 to $64,000 and in listed securities from $30,000 to $66,000. The bonds and notes outstanding in the sum of $54,000 were discharged in 1936 and thereafter all that appeared on the liability side of the ledger, other than capital and surplus, were current liabilities. These amounted to $166,000 at the close of 1937, $176,000 at the close of 1938, and $189,000 at the close of 1939. In the two tax years, 1938 and 1939, petitioner realized net earnings after taxes of $205,444.38 and $204,815.70, respectively. In each year it distributed $36,066.64, leaving undistributed earnings for the two years combined of $338,126.80, which thereby increased surplus to $468,019.36. Total assets were $1,017,696.08 at the end of 1939. The increase in total assets from December 31, 1937 to December 31, 1939 is revealed in the following round figures: Assets
12/31/37
12/31/38
12/31/39
Cash
$ 64,000
$149,000
$ 300,000
Accounts Receivable
141,000
272,000
207,000
Inventories
145,000
79,000
106,000
Listed Securities
66,000
61,000
99,000
Investment
37,000
48,000
58,000
Miscellaneous
8,000
8,000
9,000
Sub Total
461,000
617,000
779,000
Fixed Assets
357,000
396,000
427,000
Less Depreciation
161,000
177,000
189,000
Net Fixed Assets
196,000
219,000
238,000
Total Assets
$657,000
$836,000
$1,017,000
*85 By 1938 the demand for the vegetable oil compound had developed to a point beyond petitioner's capacity to produce it. During each of the years 1938 and 1939 petitioner was working beyond capacity at both of its plants; it was badly crowded and was working long hours. Several times in 1939 it was necessary to turn away new milk producers who desired petitioner to take their milk. Petitioner was continuously behind on its orders and was late on its deliveries. It was impossible for it to build up the inventories of finished goods which it was thought desirable to have on hand. In order to meet this problem petitioner in 1938 and 1939 was investigating various possibilities. Trips were made by petitioner's officers to various plants with a view to purchasing them; but for one reason or another none was ever purchased. Investigations were made of the most efficient machinery that petitioner could install. The process of manufacturing the vegetable oil compound was a "line process", and the capacity at neither of petitioner's plants could be materially increased without the addition of another complete line at each plant. More plant space was required for such additions. By the end of *86 1939 two plans had taken definite shape; one was to construct a new building near the old plant at Litchfield (the plans for which had already been drawn); the other was to build a second story to the existing plant. Early in 1940 the latter plan was decided upon. The second line installation was completed in 1941 at Litchfield. Extensive improvements and additions were made at both plants, amounting in dollars to $181,051.11 in 1940 and $249,666.45 in 1941. Total expenditures for fixed assets in the period 1936 through 1941 were $685,973.69. One of the difficulties that confronted petitioner in connection with any proposed expansion during the tax years was the existence of the so-called filled milk laws which had been enacted by the Federal and various state governments. The Federal Act, adopted in 1923, prohibits the shipments or delivery for shipment in interstate commerce of skim milk to which any fat, other than milk fat, has been added so that the resulting product is in imitation or semblance of milk, cream or skimmed milk. Punishment for violation of the act is prescribed as a fine of $1,000 or imprisonment for not more than one year, or both. Many of the states have enacted *87 statutes prohibiting the manufacture or sale of filled milk as so defined. This presented a special problem to petitioner, for its vegetable oil compound was being sold by Carolene Products Company in approximately 15 states, with approximately 50 per cent of the annual production being sold in states other than Illinois and Indiana where it was manufactured. In 1931 an action was brought against Carolene Products Company in the state courts of Illinois to collect a penalty for an alleged violation of the Illinois statute but the Supreme Court of Illinois on June 18, 1931 held the Illinois Act unconstitutional, ; . Thereafter, a new filled milk act was passed by the State Legislature which was likewise declared to be unconstitutional by the Supreme Court of Illinois on December 10, 1936. ; . On June 16, 1936 the Supreme Court of Michigan held the Michigan Filled Milk Act unconstitutional and restrained its enforcement against Carolene Products Company. *88 . Meanwhile, an information was filed by the United States against Carolene Products Company, alleging a violation of the Federal Act. The defendant demurred and on February 13, 1934 the District Court of the United States for the District of Illinois sustained the demurrer and held the Act unconstitutional. . In 1937 Carolene Products Company was indicted in the same court and again a demurrer was sustained and the law held unconstitutional. This case was appealed to the United States Supreme Court, which reversed the lower court on April 25, 1938 and held that the statute was not unconstitutional on its face and that the demurrer should have been overruled. . The case was remanded to the District Court; Carolene Products Company failed to produce any evidence; and the company was found guilty as alleged and fined $1,000. The judgment of the District Court was affirmed by the Court of Appeals *89 for the Seventh Circuit on June 8, 1939, . In the meantime, Carolene Products Company brought an action in the District Court of the United States for the District of Columbia, seeking to enjoin the Secretary of Agriculture from prosecuting criminal proceedings against it. On March 20, 1939, the Court denied the application for a temporary injunction on the ground, among others, that there was no question of multiplicity of suits involved, ; an application for a permanent injunction was denied on June 27, 1939, ; and the action of the District Court in these respects was affirmed per curiam by the and , the latter decision being handed down on October 9, 1939. In December 1939 the United States again indicted the Carolene Products Company in Illinois and also in Indiana for shipping the compound in interstate commerce and these cases were both *90 pending at the end of 1939. In November 1942 the company was again indicted under the Federal Act in the District Court for West Virginia. Petitioner was not a party to any of this litigation and in none of the cases was it contended that petitioner's product in and of itself was harmful or deleterious to health in any way. In addition to the investigations in 1938 and 1939 looking to plant expansion petitioner was seriously considering the installation of can-making machinery in order to make its own cans. It was purchasing cans from the American Can Company, approximately 50,000,000 cans a year, at a cost of approximately $500,000. In the latter part of 1938 estimates were obtained from the Cameron Can Machinery Company, Chicago, Illinois, as to the cost of machinery for the manufacture of petitioner's requirements. These estimates indicated a total cost for machinery and equipment of $214,000. Petitioner's contract with American Can Company expired at the close of 1939. At that time it renewed the contract for a period of three years, but with the express reservation that the contract should not apply to additional plants acquired by petitioner and that it could be terminated *91 upon six months' notice if petitioner decided to manufacture Net earnings after taxes aggregated its own cans. $251,156.10 and $172,682.14 in the years 1940 and 1941, respectively. Dividend distributions in those years were $144,266.66 and $108,200, respectively, leaving net undistributed earnings for both years of $171,371.58. Surplus at the close of 1941 was $633,890.94. Current liabilities increased to $369,000 at the close of 1940 and $529,000 at the close of 1941. Total assets increased to $1,524,000, as shown in the following table: Assets
12/31/39
12/31/40
12/31/41
Cash
$ 300,000
$ 230,000
$ 52,000
Accounts Receiv-
able
207,000
468,000
231,000
Inventories
106,000
68,000
501,000
Listed Securities
99,000
74,000
82,000
Investment
58,000
56,000
55,000
Miscellaneous
9,000
25,000
17,000
Sub Total
779,000
921,000
938,000
Fixed Assets
427,000
572,000
775,000
Less Deprecia-
tion
189,000
188,000
189,000
Net Fixed As-
sets
238,000
384,000
586,000
Total Assets
$1,017,000
$1,305,000
1,524,000
During the years 1938 and 1939 no loans were made by petitioner to any of its directors or officers. If all the undistributed earnings of petitioner *92 for the years 1938 and 1939 had been distributed as dividends in those years the principal stockholders of petitioner, owning approximately two-thirds of its outstanding stock, would have paid additional surtaxes of approximately $20,000 and $25,000 in the respective tax years. Petitioner's earnings were not permitted to accumulate beyond the reasonable needs of its business during either of the years 1938 or 1939, nor was petitioner during either of those years availed of for the purpose of preventing the imposition of surtaxes upon its shareholders. Opinion ARUNDELL, Judge: The question presented is one of fact. Respondent's determination that petitioner's earnings were permitted to accumulate beyond the reasonable needs of its business was prima facie correct and cast upon petitioner the burden of showing otherwise. This it has endeavored to do by coming forward with the Government and stipulating to the correctness of a large number of facts involving, for the most part, figures and tables. Standing alone, of course, the figures are somewhat meaningless and must be explained; to meet this need petitioner produced two of its officers who had a thorough knowledge of its *93 business and problems. Their testimony gave body to the figures agreed upon. It was explained that the company was badly pressed for space and that the litigation in which it was involved presented special problems in deciding upon any contemplated expansion. The existence of any tax motive in the accumulation during the tax years was emphatically denied. The Government produced no witnesses and asked no questions of petitioner's witnesses on cross-examination. Upon the whole record thus presented our ultimate finding has been made in favor of the petitioner. Petitioner's business has been expanding since 1931. By 1936 the need for additional funds was evident, not only to increase the capacity of the plant but to carry increased inventory and accounts receivable. In 1936 and 1937 substantial earnings were realized but most of them were distributed as dividends. At the same time capital was increased by some $300,000, and more than this sum was used to acquire fixed assets and inventory and to cover accounts receivable. The inference is strong that the distribution of earnings which apparently were needed in the business was induced in a large measure by the undistributed profits *94 tax that was in effect in those years. Notwithstanding the expansion of capacity in 1936 and 1937, it was apparent that there would have to be further expansion. This was not accomplished in either of the tax years 1938 or 1939, but plans therefor were being made and investigations carried on. The contemplated improvements were to be on a large scale and would involve a substantial sum of money. The improvements were made in 1940 and 1941 at a cost of approximately $430,000. The expenditure of this large sum of money for fixed assets during the two years immediately following the tax years in question, an expenditure which was foreseeable and planned for during the tax years, is to be compared with the amount of earnings for 1938 and 1939 that were retained in the business. They amounted to only $338,000. And, of course, it would be only natural to expect an increased need for working capital to take care of the business resulting from the increased plant capacity. We certainly cannot say that petitioner's directors acted other than for the best interests of the business when they retained the earnings they did in 1938 and 1939, having in mind the exceptionally large distributions *95 of the two preceding years, the rapid expansion of the business, and the fact that the extensive plant additions were actually made shortly after the taxable periods involved. On the contrary we are of opinion that the accumulation was for the reasonable needs of petitioner's business. The only contention made by the Commissioner which seems to us to merit special mention is the argument that it was illegal for petitioner to deliver its product for shipment in interestate commerce, that the contemplated plan of expansion was for the purpose of increasing production of milk to be shipped illegally, and that earnings and profits are accumulated beyond the reasonable needs of a business if they are to be used for an illegal purpose. In other words, respondent argues that the word "reasonable" as used in the statute has reference only to the reasonable needs of a lawful, and not an illegal, business. While respondent's argument may embody a sound public policy, if applied to an appropriate case, we thing it has no proper application to the present circumstances. Although the Federal Filled Milk Act was held to be constitutional on its face, there has been no suggestion that petitioner's *96 product is harmful in and of itself and the validity of the Act, as we read the opinion in , was placed upon the legislative declaration that the sale of filled milk in imitation or semblance of whole milk was a fraud on the public in that the general public could not adequately distinguish the two products. We gather from the opinion that it is open to any producer of the product, including petitioner, to show that the sale of its particular product does not as a matter of fact constitute a fraud on the public. We have no way of knowing whether petitioner can or will do this, nor is this the appropriate tribunal to delve into that question. Several indictments are now pending against the Carolene Products Company and we think the questions there pending should not be injected into this tax case. Furthermore, the Commissioner's argument is untenable because in any event it was legal for petitioner to manufacture its product in Indiana, Illinois and many other states and petitioner was giving thought to acquiring plants in several states in order to avoid interstate transactions if that became necessary. *97 Hence, it cannot be said with any degree of certainty that the funds in question were being accumulated to further an illegal purpose. Decision will be entered for the petitioner.